*Twenty-first Judicial District.*

In the Court of Common Pleas of Schuylkill County.

## MINERS' TRUST CO. BANK v. JAMES WREN, JOHN T. NOBLE, AND MATTHEW RHODA.

W., N. & R. formed a co-partnership for the single purpose of erecting a furnace for the Emaus Iron Co. They borrowed for partnership purposes, $15,000 from the Miners' Trust Company Bank, for which they gave their joint judgment obligation, and also deposited with the bank, stock of the Emaus Iron Co. as collateral security. The partnership was dissolved before the work was completed, and a short time thereafter W. was declared a bankrupt. His assignee in bankruptcy sold his real estate, at which time notice was given of the above judgment. On petition presented by the purchaser for a rule to show cause why the real estate bound by the lien of said judgment, including that of N. and R., should not be sold in the proportion or in the succession, that the owners were liable to contribute to the payment of said judgment, otherwise on the payment of the judgment, that the Miners' Trust Company Bank might be compelled to assign the judgment and the collaterals for such uses as the court might direct.

*Held :* 1. That as between the original parties, until there was a final settlement of the partnership business, the court would not subrogate W. to the rights of the plaintiff in the judgment, notwithstanding the agreement of N. and R. to pay the partnership debts; it being alleged that the partnership transactions were unsettled, that W. was a debtor to N. and R. in a large amount, and that the consideration for the promise of N. and R. to pay said partnership debts had failed.

2. That the purchase of the real estate having been made with notice of the judgment, was made subject to its payment by the purchaser, and that he had no claim to subrogation or contribution.

Rule to show cause, etc.

Opinion delivered by

PERSHING, P. J.   The material facts in this case are as follows : James Wren, John T. Noble and Matthew Rhoda, in July, 1870, made an agreement by which they became partners, under the firm style of James Wren & Co., for the erection of a furnace for the Emaus Iron Company, and for no other purpose. Of this firm, Mr. Wren was the treasurer. The interest of Wren in this contract was the one-half, whilst Noble and Rhoda jointly held the other half. Before the work was completed, viz : on the 16th October, 1871, this partnership was dissolved. By the stipulations of the agreement Noble and Rhoda were to pay all the debts due by the firm of James Wren & Co. It was also agreed that the agreement dissolving the partnership should be ''a final and complete settlement of the affairs of the partnership of James Wren & Co., and of all claims and demands of each partner upon the others, arising out of the said partnership.'' The settlement being made, as expressed in the agreement, "with the understanding that all moneys and stock received by said James Wren, as treasurer of the firm of James Wren & Co., have been applied by him for the benefit of said firm, and any mistake or error in that particular was to be corrected, nothwithstanding the settlement.'' This was followed on the 18th of October, 1871, by the receipt of Noble and Rhoda to James Wren for the books, papers, cash book, receipts, &c., of the firm of James Wren & Co., which, the receipt states, were compared and found to be correct.

On the 25th October, 1871, James Wren was adjudged a bankrupt.

During the time the firm of James Wren & Co. was in existence, viz: on July 7th, 1871, James Wren, John T. Noble and Matthew Rhoda gave their judgment obligation to the Miners' Trust Company Bank of Pottsville, for the sum of $15,000, which money was borrowed from the bank for the purposes of the partnership. Upon this judgment was entered on July 10th, 1871, in the common pleas of Schuylkill county, to No. 206, September term, 1871, the obligation having one year to run from its date. At the time this money was borrowed there was deposited with the Trust Company Bank, as collateral security for the payment of the loan, 302 shares of the stock of the Emaus Iron Company, of the par value of $50 per share, all of which stock was issued in the name of James Wren & Co., and taken by them on account of their contract for the erection of the furnace for that company. James Wren testifies that this judgment was one of the partnership debts which Noble and Rhoda agreed to pay, and that upon its payment by them, they were to receive the stock left as collateral security. Lewis C. Dougherty, assignee in bankruptcy, on the 23d March, 1872, sold three lots of ground, situate in Pottsville, as the property of James Wren, to John W. Roseberry, Esq., for the sum of ten thousand dollars ($10,000), which sale was confirmed by the United States district court. On September 3d, 1872, Mr. Roseberry presented his petition to the court, setting forth his purchase of said three lots of ground "in trust for others," that at the time of the sale by the assignee, the judgment of the Miners' Trust Company Bank was a lien on said real estate, and still was at the date of the petition a lien on said real estate, as also a lien on the real estate of John T. Noble and Matthew Rhoda; that he was informed and believed that Wren, Noble and Rhoda had given or assigned to said Trust Company Bank one hundred and fifty-one shares of the Emaus Iron Co., of the par value of fifteen thousand one hundred dollars, as collateral security for the judgment held by said bank; that in law and equity the real estate and collaterals of the said John T. Noble and Matthew Rhoda should contribute their proper proportions towards the discharge of said judgment, and praying for a rule on said Miners' Trust Company Bank to show cause "why they should not levy upon and make sale of the said real estate and collaterals liable to execution for the payment of said judgment, in the proportion in which the properties of the said James Wren, John T. Noble and Matthew Rhoda shall in law or equity be liable to contribute towards the discharge of the said judgment, otherwise upon the payment of such judgment to assign the same together with such collaterals for such uses as the court may direct."

This application is based on the 9th section of the act 22d April, 1856, Purd. Dig. 827 pl. 40. This section provides that "whenever the real estate of several persons shall be subject to the lien of any judgment to which they should by law or equity contribute, or to which one should have subrogation against another or others, it shall be lawful for any one having right to have contribution or subrogation, in case of payment, upon

suggestion by affidavit and proof of the facts necessary to establish such right, to obtain a rule on the plaintiff, to show cause why he should not levy upon and make sale of the real estate liable for the payment of said judgment, in the proportion or in the succession in which the properties of the several owners shall, in law or equity, be liable to contribute towards the discharge of the common incumbrance, otherwise upon the payment of such judgment, to assign the same for such uses as the court may direct; and the court shall have power to direct to what uses the said judgment shall be assigned," &c.

In deciding this application, we can assign Mr. Roseberry no better position than that occupied by James Wren at the date of the sale. It must be remembered that the judgment held by the Miners' Trust Company Bank was given by the members of a firm, for money borrowed for and used in the partnership business, as is shown by the evidence. Each partner is liable to pay the whole of the partnership debts, to the last acre and the last shilling, says Lord Eldon. As between partners there can be neither contribution nor subrogation. Bailey *v.* Brownfield, 8 H. 41, is a case in point. It is there held that where partners borrow money to be used in the business which they are jointly carrying on, it becomes a partnership fund, and no matter how they stand on the security given to the lender, they are accountable to one another as partners. The relation of principal and surety has no place between them. It is not the law that a partner, after paying a partnership debt, may be substituted to the rights of a creditor against his co-partner. If as between the joint debtors themselves, there is a superior obligation resting on one to pay the debt, the other after paying it may use the creditors' security to obtain reimbursement.

The reason why subrogation is not allowed to one partner as against his co-partners, or to one merely a joint debtor as against his co-debtor, is because that as between them there is no obligation resting upon one superior to that which rests upon the other. McCormick's Administrator *v.* Irwin, 11 Casey 111.

By the terms of the agreement dissolving the partnership, Noble and Rhoda agreed to pay the partnership debts of James Wren & Co., and thus took upon themselves the superior obligation, the effect of which was to fix themselves as principals and Wren as the surety, if the transactions between them stopped at this point. It is well settled that a binding agreement by which one co-partner or co-contractor assumes the debt or agrees to bear the whole burden of its payment in discharge of the rest, will give rise to the relation of principal and surety, and with it to the right of subrogation to the remedies of the creditor on the one hand, and to that of discharge on the other, if those remedies are wrongfully impaired or surrendered. 1 L. E. C. Equity 153. But the right of subrogation or of contribution is subject to principles of law which are presented by the testimony taken on this rule. Where the original debt springs from a partnership transaction, there can be no substitution before a settlement of the partnership accounts, clearly evincing that the partner whose estate

has been taken in satisfaction for the partnership debts, in defeat of his individual creditors, was not indebted to his fellow, and that no countervailing equities existed in the latter. And the duty of showing this devolves on the party claiming to be substituted, in the clearest manner. Sterling *v.* Brightbill, 5 W. 229 ; Gearhart *v.* Jordan, 1 Jones 325. If the surety be also a debtor, he has no claim to be substituted. It has been repeatedly held that care must be taken to make no order of substitution or subrogation where injustice would be done the plaintiff or other parties whose interests are involved. In the case now before us, James Wren testifies that he complied with the conditions stated in the agreement for the dissolution of the firm of James Wren & Co., and that there has been a final settlement of the partnership business. In flat contradiction of this, John T. Noble testifies that Mr. Wren has not complied with the conditions on which the dissolution was to be a settlement of their partnership transactions; that he is indebted on these transactions to Noble and Rhoda to the amount of about nine thousand (9,000) dollars, and in effect, that the consideration upon which Noble and Rhoda agreed to pay the firm debts of James Wren & Co., has failed. Here is a conflict in the evidence which cannot be decided one way or the other in this proceeding. But until it was settled, if James Wren himself were making this application, that the joint business in which he and Noble and Rhoda were engaged has been settled, and that he (Wren) was not indebted as alleged in the deposition of Noble, it is clear from all the authorities that he could demand neither contribution nor substitution. To allow either might be to destroy countervailing equities existing in his former partners.

But there is another ground which we think fatal to this application. Mr. Roseberry purchased the real estate of James Wren, subject to the judgment of the Miners' Trust Company Bank. Assignees in bankruptcy take the property of the bankrupt, subject to the liens legally and *bona fide* existing as against him. James on Bankruptcy 43. The 14th section of the bankrupt law authorises the assignee to sell the real estate subject to a mortgage, lien or other incumbrance. An assignee in bankruptcy succeeds to all the rights and interests of the bankrupt, to precisely the same extent that the bankrupt himself had, subject to and affected by all the equities, liens and encumbrances existing against them in the hands of the bankrupt, and the same rule applies to the purchaser at assignee's sale of the bankrupt's effects. Strong *v.* Clawson, 5 Gilman 346. It is part of the evidence that at the sale made by the assignee in bankruptcy of Mr. Wren, verbal and written notice was given of the existence of the judgment of the Miners' Trust Company Bank. Mr. Roseberry acknowledges it to be a subsisting lien in his petition. That his purchase was made subject to this judgment, is clear. What, then, is the legal position of the purchaser? The authorities seem to answer this question fully. One who purchases subject to a prior mortgage and pays it off, does no more than his duty. Taking an assignment is fruitless for the purpose of collecting the amount from the mortgagor's assigned estate. Cooley's appeal, 1 Gr.

401. In Hansell *v.* Lutz, 8 H. 284, the court says : the land was sold by the sheriff charged with the payment of the mortgage. How would this be usually and naturally understood ? Unquestionably that the purchaser shall discharge the mortgage, and not that he will do it if the mortgagor should fail to pay his bond. On this account the land always sells for at least the measure of the mortgage debt less than its value. Hence it follows that the purchaser in thus buying the land, undertakes the duty of paying the mortgage, not personally, but so far as the land is sufficient for that purpose. It follows also that if the obligor pay the debt, he may claim subrogation to the mortgage, else the purchaser would unjustly hold the land without having paid the entire consideration. This is explicit. Mr. Roseberry has virtually retained purchase money to the amount of this judgment. In paying it he succeeds to no right of contribution or substitution. He stands in no better attitude than if he had bought this real estate at private sale, with an obligation on his part to pay the liens against it. Rule discharged.

For rule, *John W. Ryon, Lin Bartholomew, A. W. Schalck* and *J. W. Roseberry*, Esqrs. ; for Noble and Rhoda, *Wm. B. Wells* and *Whitney & Wells;* for Miners' Trust Company Bank, Messrs. *Hughes & Farquhar;* for L. C. Dougherty, the assignee, *John W. Bickel*, Esq.

## Supreme Court of Pennsylvania.

### EASTERN DISTRICT.

## ESHLEMAN'S APPEAL.

Advances made by a grandfather to his son, and also to his grandson, after the son's decease, are chargeable to the grandson, upon distribution of the grandfather's estate, between his daughter and his grandchild.

Appeal from the orphans' court of Lancaster county.

Opinion delivered July 2, 1873, by

MERCUR, J. John Gyger died intestate, leaving a daughter, Elizabeth G. Eshleman, and a grandson, Abijah D. Gyger, the only child of his son, Jesse Gyger, who died during the life of his father. John was appointed guardian of Abijah. From time to time after Abijah became of full age, John furnished him with money and other property.

Upon the distribution of the estate of John between Elizabeth and Abijah, the question arises, whether the latter sustains such a relation to John as to be charged with the property given to him as an advancement. The precise question does not appear to have been hitherto considered by this court. If both the claimants were grandchildren of the intestate, so that they would take *per capita*, the doctrine of advancements made to them might not apply. Here, however, Abijah takes by representation. Purdon's Digest, 807, pl. 14, (C).

Section sixteenth of the act of April 8, 1833, Pur. Dig. 810, pl. 35, provides that if any child of an intestate shall have any estate by settlement of such intestate, or shall have been advanced by him in his lifetime, either in real or personal estate, to an amount or value equal to the share